UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CORPUS CHRISTI INDEPENDENT § | | |
| SCHOOL DISTRICT, § | | |
|    Plaintiff, § | | |
| § | | |
| v. § | C.A. NO. C-04-318 | |
| § | | |
| CHRISTOPHER N., § | | |
|    Defendant. § | | |

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pending before this Court is plaintiff's Motion for Summary Judgment, an appeal of the findings in the IDEA Due Process Hearing. This Court GRANTS plaintiff's Motion for Summary Judgment, and REVERSES the hearing officer's decision.

### I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### II. ISSUE

Defendant Christopher N. is eligible for special education services under the Individuals with Disabilities Education Act ("the IDEA") as a student diagnosed with Asperger's Disorder, Autism, Bipolar Disorder, ADHD, Conduct Disorder, and Major Depressive Disorder.[1] Under the IDEA, school districts must ensure that students with disabilities are accommodated and receive the same educational opportunities as other

---

[1] Asperger's Disorder was added to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) in 1994 as a separate disorder from autism.

students. School districts provide eligible students with an Individual Education Plan ("IEP") and also bear the expense of providing students with a Free Appropriate Public Education ("FAPE"). Here, the Corpus Christi Independent School District ("the school district") asserts that Chris would receive an appropriate education at Carroll High School in a more restrictive setting or with one-on-one care. Chris's parents, however, removed Chris from Carroll High School and placed him in residential treatment. The IDEA due process hearing officer reviewed Chris's parent's decision, and ruled that Chris was entitled to residential treatment at the school district's expense. This case is an appeal of the hearing officer's decision.

### III.  FACTS

During the 2002-2003 school year, the school district provided Chris with a full mainstream program. Chris earned all attempted credits and he was promoted to the eleventh grade. In the 2003-2004 school year, Chris passed all his classes in the first nine week grading period. At times, however, he skipped classes, used profanity, became upset, and left the classroom without permission. Chris's parents reported other behavior, including aggression toward his siblings, running away to his girlfriend's house, taking the family car without permission, stealing his parent's jewelry, and generally disobeying parental expectations and rules.

On December 5, 2003, school staff determined that Chris had distributed a few of his mother's Xanax pills to other students at school. That evening, Chris's mother admitted him into Methodist Hospital in San Antonio. Chris was discharged by Dr. Gundlapalli Surya one

week later. Dr. Surya recommended that Chris receive outpatient treatment in Corpus Christi, administration of various medications, and a return to normal activities. Dr. Surya noted that Chris was less depressed, less anxious, and exhibiting no aggressive or assaultive behavior. Chris's mother wrote on the discharge plan that she did not agree with Dr. Surya's conclusions. AR Vol. IV at 700.

Carroll High School decided against removing Chris from campus for the drug offense at the advice of the school psychologist. There was no evidence that Chris used drugs, or that he had ever committed any other drug related offenses. On December 19, 2003, Chris began seeing M. Dee Koch, PhD., a Corpus Christi psychologist. Dr. Koch wrote a letter to the parents' insurer stating that "Christopher is not controllable in the home at this time," and that Chris needed residential placement. Dr. Koch testified that he based his recommendation for residential treatment, in part, on the needs of Chris's family, and on preventing Chris's behavior from escalating to the point that he committed criminal offenses. AR Vol. II at 34.

In January, after the holiday break, the Admission, Review, and Dismissal ("ARD") Committee discussed possible changes to Chris's program. In light of Chris's hospitalizations and his drop in grades, the committee proposed attempting counseling and behavior specialist services, revising the Behavior Intervention Plan ("BIP"), or placing Chris in a more restrictive setting within the high school, such as a specialized behavior unit. The school psychologist proposed adding a one-to-one aide to assist Chris. Chris's father

rejected the committee's proposals and would agree only to placing Chris in a residential treatment center at the school district's expense.

On January 8, 2004, Chris's parents admitted Chris into Padre Behavioral Hospital. While at Padre Behavioral Hospital, Chris was treated by Dr. Carlos Estrada, a child psychiatrist. Drug screening showed no evidence of substance abuse. Chris reported to Dr. Estrada that his repeated hospitalizations and psychiatric appointments were causing him to miss exams and that he might have to repeat the eleventh grade. Dr. Estrada testified that Chris's mother demanded that he recommend placement in a residential treatment facility. Dr. Estrada refused to recommend residential treatment. Dr. Estrada referred the parents to a family therapist noting that "severe family dysfunction" was a liability for Chris.

On January 14, 2004, Chris's parents requested an IDEA due process hearing, seeking an order that Chris be placed in a residential treatment facility at the district's expense. Chris's parents claimed that the school district was not providing Chris with a FAPE. They claimed that the school district was failing to provide counseling, failing to conduct a functional behavioral assessment, and failing to place Chris in a program with the least restrictive environment.

On January 22, 2004, Chris was admitted to Meridell Achievement Center ("Meridell"), a residential facility in Liberty Hill, Texas. Dr. Kathryn Trosky admitted Chris. She testified that Chris told her that he didn't think he needed residential treatment, and that when Chris's mother came into the room to meet with Chris and Dr. Trosky, Chris contradicted his mother's assessment of his behavior and became angry. At that time, Dr.

Trosky decided that Chris needed residential treatment. Chris's mother signed the admitting papers, and Chris was admitted to Meridell involuntarily. Dr. Trosky testified that she didn't remember whether she reviewed Chris's school records before admitting Chris, and that all the information she learned about Chris's performance in school she received secondhand from Chris's mother.

In April, Chris's parents and the school district took part in an IDEA due process hearing. On May 20, 2004, the hearing officer ordered the school district to pay for Chris's stay at Meridell until "competent medical experts" determined he no longer needed residential placement. The hearing officer also ordered reimbursement for the costs of the Meridell placement prior to the hearing decision. During the summer of 2004, the school district conducted an evaluation of Chris. Shortly thereafter, the Meridell Achievement Center recommended that Chris be transferred to a less restrictive, socially based model. Chris was then transferred to the Bayes Achievement Center.

By operation of the IDEA's "stay put" provision Chris has remained in residential facilities at the school district's expense during this appeal. 20 U.S.C. §1415(j).[2] However, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents [are] barred from obtaining reimbursement." *Houston Indep. Sch.*

---

[2] 20 U.S.C. §1415(j) provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then- current educational placement of the child."

*Dist. v. Bobby R.*, 200 F.3d 341, 350 (5th Cir. 2000) (quoting *School Committee v. Department of Educ.*, 105 S.Ct. 1996, 2004 (1985)).

## IV.  STANDARD OF REVIEW

An aggrieved party has the right to appeal an IDEA hearing officer's decision to a district court of the United States.  20 U.S.C. §1415(i)(2)(A).  The Fifth Circuit characterizes the standard of review for an IDEA hearing officer's decision as "virtually de novo." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997). "Although the district court must accord '*due weight*' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence."  *Id.*  The court may also take "evidence of matters that have occurred since the administrative hearing under review, [making] the district court proceeding under the IDEA . . . akin to a trial de novo." *Id.*  Summary judgment is appropriate in an IDEA case when there is no genuine issue of material fact.  *Bobby R.*, 200 F.3d at 350 ("[B]ecause there were no material issues of fact presented under the other three *Cypress-Fairbanks* criteria, the district court was correct in finding that [the student] received a free appropriate public education in accordance with the IDEA.").

"The party contesting the propriety of the IEP bears the burden of establishing why the IEP and the resulting placement are inappropriate under the IDEA."  *Adam J. ex rel. Robert J. v. Keller Independent School Dist.*,  328 F.3d 804, 808 (5th Cir. 2003) (citing *Cypress-Fairbanks*, 118 F.3d at 252).  This burden applies regardless of who is the

moving party. *See, e.g.*, *Bobby R.*, 200 F.3d at 347 (school district as moving party); *Adam J.*, 328 F.3d at 808 (student as moving party).

When a parent or guardian challenges the appropriateness of an IEP crafted by the school district "a reviewing court's inquiry is generally twofold." *Cypress-Fairbanks*, 118 F.3d at 249. "It must first ask whether the state or local agency complied with the procedures set forth in the Act, and if so whether 'the individualized educational program [IEP] developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits?" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 102 S.Ct. 3034, 3048 (1982).

There are "four factors that can serve as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA." *Id.* They are:

> (1) the program is individualized on the basis of the student's assessment and performance;
> (2) the program is administered in the least restrictive environment;
> (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and
> (4) positive academic and non-academic benefits are demonstrated.

*Id.* "[R]eimbursement may be ordered in such situations only if the parents or guardians establish that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement by the parents was proper under the Act." *Id.* at 249.

"The free appropriate public education proffered in an IEP need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need

only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction. The IDEA guarantees only a basic floor of opportunity, consisting of specialized instruction and related services which are individually designed to provide educational benefit." *Adam J.*, 328 F.3d at 808 (internal citations and quotations omitted). Thus, the IDEA "cannot be read as imposing any particular substantive educational standard upon the States." *Rowley*, 102 S.Ct. at 3048.

Furthermore, "to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit." *Bobby R.*, 200 F.3d at 349.

## V. DISCUSSION

Whether the IEP was individualized and whether the services were provided in a coordinated and collaborative manner are not hotly disputed. Chris's IEP contained numerous classroom modifications and a specialized BIP that minimized removals from the classroom and negative feedback for Chris in light of his rigidity. AR Vol I at 90. In addition, there are dozens of e-mail messages in the record between staff and parents regarding Chris's academic performance. *Id.* In fact, defendant relies heavily on those

emails in his response to plaintiff's motion (*see, e.g.*, D.E. 10, p. 6-10). Therefore, the Court finds that there is no genuine issue of material fact as to whether Chris's IEP was individualized on the basis of Chris's assessment and performance, and as to whether Chris's services were provided in a coordinated and collaborative manner by the key stakeholders. The key issues in this case are (1) whether Chris's IEP at Carroll High School was the least restrictive environment that still allowed Chris to receive an appropriate education, and (2) whether it is demonstrated that Chris received tangible academic and non-academic benefits from the IEP.

## A.  Least Restrictive Environment

Chris's parents believe that Chris can only receive an appropriate education in residential treatment, while the school district contends that with changes to his program, Chris will receive an appropriate education in a regular high school setting. While residential placement may be the optimal place for Chris, the IDEA does not guarantee the ideal program. *See Rowley*, 102 S. Ct. at 3049. Furthermore, a fundamental mandate of the IDEA is its LRE requirement:

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). The federal regulation implementing the IDEA's LRE provision states that in determining the educational placement of an IDEA-eligible child,

the school must ensure that "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."  34 C.F.R. § 300.552(c).

The Texas Education Agency ("TEA") has promulgated rules regarding when a student's committee may find that residential placement is necessary.  The rules state that an application for residential placement shall not be approved if the "district did not attempt to implement lesser restrictive placements prior to residential placement."  19 TEX. ADMIN. CODE § 89.61(b)(1)(D).  The school district must verify that the education provided at the residential facility is appropriate and that the placement is the least restrictive environment.  *Id.* at § 89.61(a)(4)(F)(iii).  Each school district is required to ensure that a continuum of alternative placements, including special classes, itinerant instruction, resource classes, and home instruction, among others, is available to meet the needs of students with disabilities.  20 U.S.C. §1412(a)(5); 34 C.F.R. § 300.551; *see also* 19 TEX. ADMIN. CODE § 89.63(c) (Texas' implementation of the continuum of placements requirement).

The IDEA does "not contemplate an all-or-nothing educational system in which [disabled] children attend either regular or special education.  Rather, the Act and its regulations require schools to offer a continuum of services.  Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with [nondisabled] children during

lunch and recess.  The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops.  If the school officials have provided the maximum appropriate exposure to [nondisabled] students, they have fulfilled their obligation under the [IDEA]." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir. 1989) (internal citations omitted) (interpreting the LRE provision in the Education of the Handicapped Act, the IDEA's predecessor).

      The hearing officer in this case, however, changed Chris's placement from mainstream education to the opposite end of the continuum in one fell swoop.  The hearing officer concluded that although a one-on-one aide with counseling and other services within the public school would be a prudent and legally supportable position, the school district's proposed changes came too late.  However, under the IDEA, the school district did exactly what it was required to do: propose intermediate changes to Chris's IEP that provided maximum exposure and interaction with nondisabled students.

      The record shows that Chris passed all of his classes in the 2002-2003 school year, that Chris passed his classes in the first nine week grading period of 2004, and that Chris began experiencing a significant academic slump in the second nine week grading period.  The hearing officer agreed with Chris's parents that because Chris was experiencing a decline in the second nine week grading period, Chris needed to be removed from public high school and involuntarily placed in residential treatment.  However, "schools must retain significant flexibility in educational planning if they truly are to address each child's needs." *Daniel R.R.,* 874 F.2d at 1044.

While Chris's behavior at school was certainly disruptive, there is evidence that assigning a one-on-one aide and perhaps transferring Chris to the vocational program at Miller High School would have been successful.  At the January 7, 2004 ARD meeting, a teacher reported that Chris had worked harder and improved significantly when the last ARD meeting mentioned the possibility of moving to the vocational program at Miller.  AR Vol. III at 8.  The committee thought that a more restrictive environment, such as the program at Miller, would lead to improvement and increased motivation.  *Id.*

Assigning a one-on-one aide or moving Chris to another high school in the area with a program more tailored to his interests and needs meets the "continuum of services" requirement imposed on school districts under the IDEA.  Here, Chris was moved directly from a mainstream education program to involuntary residential treatment.  While there is no doubt that Chris was experiencing academic problems at the time of his move, those problems were of relatively recent vintage.  There was still time for the school district to move further down the continuum of services before taking the drastic step of placing Chris in involuntary residential treatment.  Furthermore, the IDEA mandates that the school proceed in such a fashion.  Therefore, the Court finds that the school district's untested intermediate proposals were the least restrictive environment for Chris to obtain an appropriate education.  The Court will now turn to the fourth *Cypress-Fairbanks* factor – whether Chris received tangible academic and non-academic benefits from the school district's IEP.

**B.  Positive Academic and Non-Academic Benefits Demonstrated**

In *Cypress-Fairbanks*, the Fifth Circuit addressed whether a student, Michael F., had achieved positive academic and non-academic benefits from his school district's IEP. Michael attended regular classes and had access to content mastery class. 118 F.3d at 249. His ARD committee later supplemented Michael's IEP with a behavioral plan that allowed "time-out" and "cooling" off periods when he became agitated. *Id.* When Michael was diagnosed with Tourette's syndrome, his introduction to the medication regime resulted in "two physically violent episodes." *Id.* In response, the committee "resolved that Michael's needs would be better addressed with a more consistent behavioral structure throughout the day." *Id.* He was placed in a self-contained adaptive unit for three subjects, and attended regular classes for two subjects. *Id.* "The ARD Committee also supplemented Michael's program by providing him with a social behavior curriculum in his adaptive behavior classes, psychological counseling services, and a discipline contingency plan." *Id.*

Michael's disruptive and aggressive behavior continued, however, including an incident where "he announced in class that he was going to kill his mother, spat in a student's face, hit the student, and directed obscene language at his teacher." *Id.* at 249-50. The next year, he continued to disrupt class with some frequency, maintained satisfactory grades in his classes, but had difficulty turning in assignments. *Id.* at 250. Michael was "emergency removed" from school after fighting with a girl, pinning her down, and pulling out her hair. *Id.* At the time his parents unilaterally placed him in a residential center, his academic performance was inconsistent. *Id.* However, the

*Cypress-Fairbanks* court gave great weight to the opinions of Michael's school's staff. The court agreed with the district court's findings that Michael's IEP "was reasonably calculated to, and in fact did, produce more than a modicum of educational benefit" relying on "the opinion of those individuals who had the most immediate knowledge of his performance during his enrollment [in the school district] – the teachers who worked with him on a daily basis, the assistant principal who was primarily responsible for administering Michael's discipline plan, and the school psychologist who counseled Michael during this period." *Id.* at 254.

Chris's IEP, like Michael's IEP in *Cypress-Fairbanks*, involves access to content mastery classes on request, ignores minor infractions, refrains from negative feedback, and allows Chris to cool off when upset. AR Vol. III at 180. Furthermore, the summary judgment record indicates that Chris was making progress and reaping academic and non-academic benefits. For example, at a committee meeting on May 21, 2003, it was reported that Chris had good days and bad days in Content Mastery Class (CMC). *Id.* Mr. Williams, the CMC teacher, reported: "Student reacts well to positive reinforcement. Some days he works but other days he doesn't." *Id.* Mr. Williams also testified that he has been successful at getting Chris on task, and that once Chris was on task, he will do the work. *Id.* at 206. Chris often confided in Mr. Williams about his problems at home, situations with his girlfriend, and about wanting to be normal. *Id.* at 208.

An administrator, Ms. Neil, stated that Chris's wandering in the hall had decreased and that his social skills had improved, though she was still concerned by his use of

profanity.  *Id.*  Chris's counselor, Ms. Adler also noted improvement with socialization. *Id.*  His speech therapist noted improvement in communication and language skills, and recommended that he no longer needed speech services.  *Id.*  His other teachers reported borderline grades, attendance problems, a tendency to be behind in class, and sleeping during class.  *Id.*  In the following school year, another committee meeting was called to discuss a progress report indicating that Chris was failing all of his classes.  *Id.* at 228. Updates from teachers were given and they reported that Chris was in fact passing all of his classes.  Two teachers reported that Chris had been asking questions in class and that he was understanding the content and learning new skills. *Id.*  The school district emphasizes that a substantial benefit of Chris's program at Carroll High School was that he had built a rapport with several teachers, and that he was able to socialize with his friends and girlfriend.  The Court agrees that those are important benefits found in Chris's IEP.

      The Court understands that outside of school, Chris has a history of violent behavior and a penchant for running away, that Chris was absent many times and behind in many classes, and that Chris had not been regularly attending his counseling or content mastery classes.  Chris's mother testified that she was frustrated that the committee would only tell her how wonderful Chris was doing, despite behavioral incidents including throwing a chair out the window.  AR Vol. II at 124-25.  She also testified that the school was not following the behavior management plan, and rewarding Chris for his bad behavior with gift certificates and positive reinforcement.  *Id.* at 125.  However, although

the summary judgment record shows that Chris was not receiving an ideal level of academic benefits at Carroll, and that Chris had significant behavioral problems at home, there is no genuine issue of material fact about whether Chris was making some progress and receiving tangible academic and non-academic benefits under the school district's IEP.  Thus, defendant has not shown why the IEP the school district prepared for Chris was inappropriate under the IDEA.

### C.  Education at Meridell

Parents of IDEA-eligible students seeking public funding for a residential placement must not only prove that the student cannot receive an appropriate education in any placement on the school's continuum of services, but must also show that the proposed private placement is appropriate and can confer an appropriate education.  *Sch. Comm. of Burlington v. Dept. of Educ. of Mass.*, 105 S. Ct. 1996, 2002-03 (1985). However, the Court has already found that the defendant has not raised a fact issue as to wether the school district's IEP was appropriate.  Therefore, because the Court finds that the "IEP in the local public school district was appropriate . . . there is no need to inquire further as to the appropriateness of [the private] program."  *Teague ISD*, 999 F.2d at 132. Nevertheless, assuming *arguendo* that the school district's IEP was inappropriate, the Court also finds that the defendant has not met his burden and raised a fact issue as to whether Chris's involuntary residential treatment at Meridell was appropriate.

The Fifth Circuit has held against public funding where the student's benefit from the educational services in residential treatment was "equivocal" and where the "focus

was on behavior management" rather than schoolwork. *Teague ISD*, 999 F.2d at 132. Chris's records at Meridell indicate that he still has behavioral problems, and has suffered greatly being away from his home and his friends. Chris's full day program at Carroll was reduced to only four hours of school a day at Meridell. This decision was unilaterally imposed by the facility, and was not an individualized decision based on his needs. Chris's IEP at Meridell contained no individually designed Behavior Intervention Plan (BIP), only a one-page form entitled "Facility Behavior Management Plan" with few strategies specific to Chris's needs. AR Vol. IV at 670; AR Vol. II at 368. Chris was also placed in a sixth grade level math class, despite the fact that he had already passed tenth grade geometry. AR Vol. IV at 408, 413, 676, 680.

 Chris resisted the Meridell placement and challenged his therapists. At times, he was not even allowed to go to school because of his behavioral outbursts. AR Vol. II at 70; AR Vol. IV at 659-64. Dr. Estrada, Chris's psychiatrist from Padre Behavioral Center, testified that the residential placement appeared to only have made Chris "even more angry and alienated." AR Vol. II at 380. The district psychologist, Dr. Kuhl-Babcock, testified that she felt Chris "was not really buying into the program." AR Vol. II at 371-72. The hearing officer himself noted that "Christopher has experienced limited to marginal academic progress while he has been in Meridell." AR Vol. I at 9. Therefore, the Court finds that the defendant has not met his burden and shown that the private placement at Meridell is appropriate.

## VI.  CONCLUSION

Defendant has not met his burden and shown that plaintiff's IEP was inappropriate, or that Chris's private residential placement at Meridell was appropriate. Plaintiff's motion for summary judgment is GRANTED, and the decision of the hearing officer is REVERSED.  Defendant is not entitled to reimbursement from plaintiff for expenses incurred in unilaterally placing Christopher N. in private residential treatment.

ORDERED this __31__ day of March, 2006.

*Hayden Head*
_____
HAYDEN HEAD
CHIEF JUDGE